ROBIN DAVIDSON, Plaintiff v. UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, Defendant

No. COA00-16

(Filed 3 April 2001)

**1. Tort Claims Act— negligence—affirmative duty of care— special relationship**

The Industrial Commission erred in a claim against defendant under the Tort Claims Act by concluding that defendant university did not have an affirmative duty of care arising out of a special relationship toward a student athlete who was a member of

DAVIDSON v. UNIV. OF N.C. AT CHAPEL HILL

[142 N.C. App. 544 (2001)]

a school-sponsored intercollegiate team and was injured while practicing a cheerleading stunt for the school's JV cheerleading squad because: (1) the university depended upon the cheerleading program for a variety of benefits such as cheerleading at JV basketball games, women's basketball games, and wrestling events, representing the university at a trade show, and entertaining alumni before games; (2) the cheerleaders acted as representatives of the school at official athletic events; (3) the cheerleaders received significant benefits from the university as a result of participating in the cheerleading program such as receiving school uniforms purchased by the school, receiving transportation by the university, using university facilities and equipment for practices, and satisfying one hour of the school's physical education requirement; and (4) the university exerted a considerable degree of control over its cheerleaders.

2. **Tort Claims Act— negligence—affirmative duty of care— voluntary undertaking to advise and educate regarding safety**

The Industrial Commission erred in a claim against defendant under the Tort Claims Act by concluding that defendant university did not have an affirmative duty of care toward a student athlete who was a member of a school-sponsored intercollegiate team and was injured while practicing a cheerleading stunt for the school's JV cheerleading squad based on defendant's voluntary undertaking to advise and educate the cheerleaders regarding safety because: (1) defendant has acknowledged that it assumed certain responsibilities with regard to teaching the cheerleaders about safety; and (2) the conduct of various employees of the university implicitly establishes that the university had undertaken to advise and educate the cheerleaders regarding safety.

Appeal by Plaintiff from order entered 29 September 1999 by the North Carolina Industrial Commission. Heard in the Court of Appeals 8 January 2001.

*Anderson & Anderson, by Michael J. Anderson, for plaintiff-appellant.*

*Michael F. Easley, Attorney General, by E. Harry Bunting, Special Deputy Attorney General, and Allison Smith Corum, Assistant Attorney General, for defendant-appellee.*

HUDSON, Judge.

Robin Davidson (plaintiff) appeals from the "Decision and Order for the Full Commission" (the Order) filed by the North Carolina Industrial Commission (the Commission) on 29 September 1999. We reverse and remand.

I.

The evidence presented to the Commission tended to show the following facts. During the 1984-85 school year, plaintiff was a sophomore at the University of North Carolina at Chapel Hill (defendant), and a member of the school's junior varsity cheerleading squad (the JV squad). The JV squad began practicing a stunt called a "two-one-chair" pyramid approximately three or four weeks before Christmas vacation. The two-one-chair pyramid typically involves two male cheerleaders standing side by side on the floor, a third male cheerleader standing on their inside shoulders with one arm extended straight up, and a female cheerleader who is lifted up to sit on the hand of the third male cheerleader. Initially, Leslie Greene was chosen to perform in the top position of the pyramid for the JV squad, but she had injured her ankle and was unavailable to perform the stunt. Emily Blount was chosen to perform in the top position in place of Greene, but during the first week that the squad attempted to perform the pyramid, Blount fell from the pyramid and injured her tail-bone. As a result, plaintiff was chosen to perform in the top position, despite the fact that she weighed about twenty pounds more than Blount.

On 15 January 1985, the JV squad was warming up on the hardwood floor of Carmichael Auditorium prior to a women's basketball game. Although the squad typically used mats during practices, the squad did not use mats in Carmichael Auditorium during games or while warming up before games, and mats were not used on this occasion. During the warm-up, the squad attempted the two-one-chair pyramid with plaintiff in the top position. Plaintiff reached the top of the pyramid but became unstable and began falling backward. As the pyramid leaned backward, the cheerleader holding plaintiff pushed her forward and plaintiff fell approximately thirteen feet. Because the pyramid had leaned backward at first, the spotters were out of position. As plaintiff landed, the spotters were unable to prevent her shoulders and head from hitting the hardwood floor. Plaintiff suffered permanent brain damage and serious bodily injury as a result of the fall.

Conflicting testimony was offered regarding the number of spotters used for the pyramid at the time of the accident. John Graham, a JV squad member at the time of the accident, testified that there were only two spotters: himself and a female cheerleader, Jeanette Everette. However, Jay Tobin, who was the co-captain of the JV squad along with plaintiff at the time of the accident, testified that there were three spotters: Graham, a second male cheerleader in front of the pyramid, and Everette behind the pyramid. There was also conflicting testimony regarding whether the squad was prepared to perform the pyramid on this date. Graham testified that he had been nervous about the stunt because Everette, who was only a few pounds heavier than plaintiff, had only practiced spotting the stunt for one week. Graham was also nervous because he had only been on the squad for four months and had no prior cheerleading experience. However, Tobin testified that the pyramid had been very steady during practices before that night, and that plaintiff appeared to be very comfortable with the pyramid.

The university did not provide a coach for either the JV squad or the varsity squad during the 1984-85 school year. The varsity squad had an administrative advisor, Mary L. Sullivan, who worked for UNC on a part-time basis. Sullivan was responsible for uniforms, travel plans, discipline, and making sure the varsity squad members achieved a certain minimum GPA. Sullivan was not hired as a coach, and she had not received any formal training to be a coach. Sullivan saw the JV squad members only when they practiced in the same gym as the varsity squad, but even at these times Sullivan did not actively interact with the JV squad. In fact, plaintiff could not recall having ever met Sullivan.

The JV squad members, without a coach or an advisor, taught themselves how to perform stunts, and received no safety training or instruction. The squad members made decisions on their own as to when they were ready to perform certain stunts. The squad members were not provided any training in order to make such evaluations. There were no specific individuals to whom the JV squad members were supposed to report regarding injuries, such as Blount's injury, or to whom the squad members were supposed to turn for help in evaluating stunts that needed improvement. The squad received occasional guidance from the varsity cheerleaders, including the captain of the varsity squad, Robert Stallings, but the JV squad was not formally supervised by the varsity squad. Stallings testified that, as the captain of the varsity squad, he had no formal responsibilities toward the JV squad.

Up through January of 1985, UNC had not adopted guidelines regarding the experience required to join either cheerleading squad, the skill level required to perform particular stunts, or safety in general. Stallings testified that UNC "never shared with [the cheerleaders] information regarding safety and technical cheerleading skills." UNC sent the varsity squad members to summer camps run by the Universal Cheerleaders Association (UCA) where they learned cheerleading skills and safety techniques, and where they were exposed to the UCA guidelines for cheerleading and safety. The JV squad members, however, were not sent to cheerleading camps, and the UCA guidelines were never officially adopted by UNC.

UNC provided both squads with school uniforms, transportation to away games and other events, and access to university facilities and equipment. In addition, a student's participation on the JV or varsity squad allowed the student to opt out of one hour of physical education credit. The JV squad, in addition to cheering at JV basketball games, women's basketball games, and wrestling events, represented UNC at a trade show, and regularly entertained the Rams Club (consisting of contributors to the university) prior to games. Plaintiff testified that the cheerleaders were considered representatives, or ambassadors, of the school, and that they had to abide by certain standards of conduct, such as maintaining a minimum GPA and refraining from drinking in public.

Donald Boulton was the Vice Chancellor and Dean for Student Affairs at UNC from 1972 through 1995, and during the 1984-85 academic year the cheerleading squads were the responsibility of the Office of Student Affairs. Student Affairs maintained a budget of approximately $11,000.00 for both cheerleading squads during the 1984-85 school year. The varsity squad advisor, Sullivan, answered directly to Boulton, and Sullivan testified that Boulton exercised supervisory authority indirectly over the varsity squad through her. Prior to 1984, the cheerleading squads had been the responsibility of the Department of Student Life; Frederic Schroeder was the Director of Student Life during this time. Boulton acknowledged that the cheerleaders represented the school in official athletic events.

Unbeknownst to the JV cheerleaders, there had been considerable concern expressed by members of the UNC faculty and staff regarding the safety of cheerleading stunts, and pyramids in particular, prior to plaintiff's accident. For example, on 3 October 1980, the Associate Vice Chancellor for Student Affairs, James Cansler, wrote a memo to Dean Boulton expressing his concern about cheerleading

safety in regard to both varsity and JV cheerleaders. Cansler recounted that four UNC cheerleaders had been injured in 1980, at least one of whom was injured when she fell from a pyramid. Cansler also stated that because cheerleaders represented the school at official athletic events and at public relations events, and because they were selected by a university sanctioned process, UNC should consider forming a special commission to study whether certain cheerleading routines were too dangerous to be permitted. No such commission was ever formed. On 29 April 1981, Schroeder wrote a letter to the coach of the cheerleading squad at the time stating that multi-level pyramids should be prohibited due to the danger to participants. On 25 August 1981, and again on 18 February 1982, Schroeder wrote to the co-captains of the varsity squad expressing his concern regarding the safety of certain cheerleading stunts, including pyramids, and expressing his opinion that the varsity squad should adopt safety guidelines and should tailor the stunts each year to the particular abilities of the members of the squad. Although Schroeder testified that he intended this information to be communicated to the JV squad by the varsity squad, the letters do not mention the JV squad, and Schroeder conceded that he does not know whether the information was, in fact, imparted to the JV squad.

In 1983, the Atlantic Coast Conference (ACC) adopted a policy prohibiting cheerleaders from engaging in pyramids "more than two high." Schroeder wrote a letter in October of 1983 to the Director of Athletics for UNC, asking for clarification of the phrase "more than two high" in the ACC prohibition. In response, Schroeder received a letter from the Assistant Athletic Director at UNC, stating that the ACC had decided to make "any interpretations concerning cheerleaders an institutional decision," and asking Schroeder and the Department of Student Life to "take charge of any future decisions with regard to the safety and well-being" of the cheerleading squads. It is not clear whether the ACC had actually rescinded the prohibition against pyramids "more than two high," or whether it had simply decided to allow the individual ACC schools to interpret this prohibition for their own squads.

Dean Boulton received a copy of each of the letters mentioned above. Boulton acknowledged that he was aware, as of 1981, that multi-level pyramids, "in the hands of people improperly prepared," were viewed as dangerous. He also acknowledged that he was aware of the growing body of concern regarding cheerleading stunts, and that he knew the ACC had banned pyramids higher than two levels at

one point in 1983. Boulton testified that UNC generally provides "education on safety" for all of its students in all of their activities, and that "the University['s] responsibility for student activities is to provide them with the information that they need relative to safety." He also stated that UNC sought "to advise and educate" students in their activities and to "present this information and instruct them."

Boulton testified that the varsity cheerleaders were provided with safety instructions at the UCA summer camps, and that the varsity squad "had the opportunity to hear safety regulations from the gymnastics coach, from their advisors, from a variety of sources." However, Boulton conceded that he did not know whether the JV squad in 1984-85 received any safety instruction from the school. When asked who would have had the responsibility of evaluating whether the JV squad members were competent to perform certain stunts, Boulton stated that he could not recall. When asked whether there was any effort on the part of UNC to enforce the UCA guideline that pyramids over two persons high should not be performed on a basketball court without the use of tumbling mats, Boulton stated, "I don't recall." Boulton also conceded that he did not know whether the JV squad received information regarding the ACC recommendations against pyramids over two levels high, or whether the JV squad was informed of Schroeder's concerns regarding pyramid stunts. Boulton acknowledged that UNC did not take a position regarding pyramids over two persons high following the ACC ban in 1983. Boulton testified that the process of evaluating cheerleading safety guidelines did not begin until approximately January of 1984, and that no guidelines were implemented until the summer of 1985, a few months after plaintiff's injury.

Plaintiff acknowledged that, prior to the accident, she understood that there was a risk she might fall from the top of the pyramid and that the spotters might not catch her. Plaintiff also testified that she expected UNC to look out for her, and that she expected the cheerleaders would receive sufficient training from UNC. Both plaintiff and Tobin testified that they had no knowledge that members of the UNC faculty and staff had expressed concern regarding the safety of cheerleading stunts. Tobin testified that he had no knowledge that the ACC had recognized the danger of pyramids higher than two levels and had, at one time, officially prohibited them. Tobin also testified that he had never seen the UCA guidelines, and that he had never been told that the guidelines recommended not performing a pyramid over two levels high on a hard floor without mats.

In sum, the evidence showed that the varsity squad members, who were older, more skilled, and more experienced, were provided with a supervisor, were provided with safety instruction through the UCA camps, were informed of the known risks involved in performing pyramids, and were admonished to create and abide by specific safety guidelines. However, the JV squad members, who were younger, less skilled, and less experienced, did not have a supervisor, received no safety training, received no information regarding risks involved in performing pyramids, and were left on their own to make decisions regarding safety procedures.

Robert Stallings, the co-captain of the varsity squad in 1984-85, was a JV cheerleader in 1982-83, and a varsity cheerleader for the following three years. Stallings worked for UCA during three summers while attending UNC, during which summers he taught high school and college cheerleaders how to perform various cheerleading stunts, including pyramids, and also taught safety in performing those stunts. In his second and third summers at UCA, Stallings was a head instructor, responsible for teaching all of the cheerleading teachers at the weekly camps. Stallings was subsequently hired as the coach for the UNC at Wilmington cheerleading squad for the academic years of 1988-89 and 1989-90, and he has coached a high school squad in Alabama every year since 1990. Since graduating in 1986, Stallings has remained on UCA's payroll as a cheerleading consultant and choreographer.

Stallings opined that UNC should have implemented formal guidelines for cheerleading safety, such as the UCA guidelines, and that UNC should have provided a qualified, knowledgeable coach for both the varsity and JV squads during the 1984-85 school year. Stallings further testified that the two-one-chair pyramid is the most difficult pyramid that can be performed at that height, and that it should not have been performed on a hardwood floor without mats at any time. Defendant's expert witness, Lance Wagers, testified that it was fairly common for cheerleading teams at the university level in 1985 to have an administrative advisor rather than a formal coach, and to have little guidance with regard to developing skills and stunts.

## II.

In December of 1987, plaintiff filed a claim against defendant pursuant to the Tort Claims Act, N.C.G.S. §§ 143-291 to -300.1 (1999), alleging negligence on the part of nine individuals, including Sullivan

and Boulton. Deputy Commissioner Richard B. Ford first heard the case and filed a Decision and Order in favor of plaintiff on 2 February 1998. Defendant appealed to the Full Commission. The Full Commission reversed, making the following findings:

> 9. Defendant did not owe plaintiff a duty to provide coaching or faculty supervision to monitor the activities and stunts of the cheerleading squad, nor did defendant owe plaintiff a duty to prohibit 2½-tier pyramid stunts. This absence of an affirmative duty is not only reasonable in terms of defendant's responsibilities, but also serves to protect student autonomy.

> 10. Plaintiff failed to produce sufficient evidence that any named employee of defendant breached any duty owed to her or was negligent.

The Commission also reached the following conclusion as a matter of law:

> Defendants' named employees did not breach any legal duty owed to plaintiff, nor did they commit any acts of negligence which proximately resulted in plaintiff's injuries; therefore, plaintiff is not eligible to recover under the [Tort Claims Act].

On appeal, plaintiff challenges the Commission's findings, including findings 9 and 10, as well as the Commission's legal conclusion. In reviewing a decision of the Industrial Commission in a case arising under the Tort Claims Act, we are limited to addressing (1) whether the Commission's findings of fact are supported by any competent evidence, and (2) whether the findings of fact support the Commission's conclusions of law and decision. *See, e.g., Simmons v. N.C. Dept. of Transportation*, 128 N.C. App. 402, 405-06, 496 S.E.2d 790, 793 (1998). Whether a defendant owes a plaintiff a duty of care is a question of law. *See Pinnix v. Toomey*, 242 N.C. 358, 362, 87 S.E.2d 893, 897 (1955). Here, the Commission's findings 9 and 10, although designated "findings of fact," are conclusions of law to the extent they conclude that defendant did not owe an affirmative duty of care to plaintiff. The Commission's designation of a finding as either a "finding of fact" or a "conclusion of law" is not conclusive. *See Martinez v. Western Carolina University*, 49 N.C. App. 234, 239, 271 S.E.2d 91, 94 (1980). Thus, we review the legal conclusion that defendant did not owe plaintiff an affirmative duty of care to see whether this conclusion is supported by the findings of fact.

We note that plaintiff asks this Court to hold that plaintiff's claim is not barred by the doctrines of contributory negligence or assumption of risk. However, the Commission did not reach these issues because it found defendant had not breached a duty to plaintiff. Therefore, these issues are not properly before us on appeal. In addition, plaintiff asks this Court to find that portions of the testimony offered by Lance Wagers, defendant's expert witness, should be excluded. Plaintiff did not assign error to the Commission's admission of this testimony and, as a result, may not raise this issue on appeal. *See* N.C.R. App. P. 10(a).

### III.

[1] The issue presented is whether a university has an affirmative duty of care toward a student athlete who is a member of a school-sponsored, intercollegiate team. At the outset of our analysis, we note that this is an issue of first impression in North Carolina. However, to the extent that established principles of tort law in our State are applicable to the instant case, those principles are authoritative and control our analysis.

Actions to recover for negligence under the Tort Claims Act are guided by the same principles applicable to negligence actions against private parties. *See Bolkhir v. N.C. State Univ.*, 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988). Therefore, plaintiff in the instant case must establish the following elements: (1) that UNC owed plaintiff a duty of care under the circumstances; (2) that actions or omissions by at least one of the named employees of UNC constituted a breach of that duty; (3) that the breach was the actual and proximate cause of plaintiff's injury; and (4) that plaintiff suffered damages. *See id.*; *Cucina v. City of Jacksonville*, 138 N.C. App. 99, 102, 530 S.E.2d 353, 355, *disc. review denied*, 352 N.C. 588, —— S.E.2d —— (2000). The Commission concluded that defendant owed no "affirmative duty" of any kind to plaintiff and, therefore, that defendant did not breach any duty of care. This conclusion constitutes reversible error because defendant did owe an affirmative duty of care to plaintiff as a matter of law.

"Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law." *Pinnix*, 242 N.C. at 362, 87 S.E.2d at 897. Thus, the preliminary question is whether defendant owed a duty of care to plaintiff under the circumstances. Traditionally, courts have distinguished between negligence claims

based on affirmative acts and those based on omissions. *See* David A. Logan and Wayne A. Logan, *North Carolina Torts* § 1.20, at 8 (1996) (hereinafter Logan). Within the context of the Tort Claims Act, recovery may be had in cases involving both negligent acts and omissions as a result of an amendment to G.S. § 143-291 in 1977 that substituted the word "negligence" in place of "negligent act." *See Phillips v. N.C. Dept. of Transportation*, 80 N.C. App. 135, 136, 341 S.E.2d 339, 340 (1986); Charles E. Daye and Mark W. Morris, *North Carolina Law of Torts* § 19.42.11.2, at 306 (1st ed. 1991) ("The state can now be held liable for negligent omissions and failures to act, thus greatly extending the scope of liability and the claimant's ability to recover damages.").

In cases involving omissions, negligence may arise where a "special relationship" exists between the parties. *See King v. Durham County Mental Health Authority*, 113 N.C. App. 341, 345, 439 S.E.2d 771, 774, *disc. review denied*, 336 N.C. 316, 445 S.E.2d 396 (1994). A helpful description of the category of cases in which an affirmative duty to act is imposed upon a defendant as a result of a special relationship is set forth in a leading treatise on the law of torts:

> During the last century, liability for [omissions] has been extended still further to a limited group of relations, in which custom, public sentiment and views of social policy have led the courts to find a duty of affirmative action. In such relationships the plaintiff is typically in some respect particularly vulnerable and dependant upon the defendant who, correspondingly, holds considerable power over the plaintiff's welfare. In addition, such relations have often involved some existing or potential economic advantage to the defendant. Fairness in such cases thus may require the defendant to use his power to help the plaintiff, based upon the plaintiff's expectation of protection, which itself may be based upon the defendant's expectation of financial gain. . . . There is now respectable authority imposing the same duty upon a shopkeeper to his business visitor, upon a host to his social guest, upon a jailor to his prisoner, *and upon a school to its pupil*.

W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 56, at 373-74, 376-77 (5th ed. 1984) (emphasis added). Thus, where the alleged negligence is premised on a defendant's failure to protect a plaintiff from a harm that the defendant did not directly create, as in the instant case, the defendant may be held liable if a special rela-

tionship existed between the parties sufficient to impose upon the defendant a duty of care.

We believe the factual circumstances and policy considerations in this case warrant the conclusion that a special relationship existed between the parties. Various scholars, authorities, and courts in other jurisdictions considering the issue before us have recognized that special relationships are most often premised upon the existence of mutual dependance. *See* Edward H. Whang, *Necessary Roughness: Imposing a Heightened Duty of Care on Colleges for Injuries of Student-Athletes*, 2 Sports Law J. 25, 39 (1995) (hereinafter Whang); Restatement (Second) of Torts § 314A, cmt. b (1965); *University of Denver v. Whitlock*, 744 P.2d 54, 59-61 (Colo.1987) (noting that dependence is a basis for recognizing a special relationship giving rise to a duty of care); *Beach v. University of Utah*, 726 P.2d 413, 415-16 (Utah 1986) (noting that "the essence of a special relationship is dependence by one party upon the other or mutual dependence between the parties"). Here, UNC depended upon the cheerleading program for a variety of benefits. The JV squad was responsible for cheerleading at JV basketball games, women's basketball games, and wrestling events. The JV squad represented UNC at a trade show, and often entertained the Rams Club before games. Plaintiff testified, and Boulton acknowledged, that the cheerleaders acted as representatives of the school at official athletic events. Likewise, the cheerleaders received significant benefits from UNC as a result of participating in the cheerleading program. They were provided school uniforms purchased by the school. They were provided transportation by UNC, and they used university facilities and equipment for practices. Participation on the JV or varsity squad allowed the student to satisfy one hour of the school's physical education requirement.

We also find it significant that UNC exerted a considerable degree of control over its cheerleaders. Typically, schools exert a high degree of control over many aspects of a student athlete's life. *See* Whang at 43. Here, UNC cheerleaders had to abide by certain standards of conduct, such as maintaining a minimum GPA and refraining from drinking alcohol in public. Such control affects our analysis in at least two ways. First, the argument that a duty of care should not be imposed upon a school because it may stifle student autonomy is considerably less compelling where the school already exerts significant control over the students in question. Second, when a school exerts significant control over students as a result of their participation in a school-sponsored athletic activity, the stu-

dents may have higher expectations with regard to the protection they will receive from the school. Here, plaintiff testified that she expected UNC to look out for her, and that she expected the cheerleaders would be adequately trained. Such expectations can result in the assumption by a student that, in the absence of any warning from the school that particular activities pose a significant risk, such activities have been determined to be safe. This kind of assumption may then prevent the student from making an independent assessment of the risk posed by those activities. *See Whitlock*, 744 P.2d at 60 (explaining how increased control by a university can interfere with a student's ability to make independent decisions regarding safety).

We find support for our conclusion in the decisions of other jurisdictions that have addressed similar issues. For example, in *Kleinknecht v. Gettysburg College*, 989 F.2d 1360 (3d Cir.1993), the Third Circuit held that a special relationship existed between the defendant college and the plaintiff, who was a student participating in a scheduled practice for an intercollegiate lacrosse team sponsored by the college. The court placed emphasis on the fact that the college actively recruited the student, finding that this fact revealed the extent to which the student's participation on the team benefitted the school. *See id.* at 1368.

We emphasize that our holding is based on the fact that plaintiff was injured while practicing as part of a school-sponsored, intercollegiate team. Our holding should not be interpreted as finding a special relationship to exist between a university, college, or other secondary educational institution, and every student attending the school, or even every member of a student group, club, intramural team, or organization. We agree with the conclusion reached by other jurisdictions addressing this issue that a university should not generally be an insurer of its students' safety, and that, therefore, the student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care. *See Whitlock*, 744 P.2d at 61; *Baldwin v. Zoradi*, 123 Cal.App.3d 275, 176 Cal.Rptr. 809 (1981); *Beach*, 726 P.2d at 416.

As a result of the special relationship between the parties in the instant case, defendant and its employees had an affirmative duty to exercise that degree of care which a reasonable and prudent person would exercise under the same or similar circumstances. *See, e.g., Hart v. Ivey*, 332 N.C. 299, 305, 420 S.E.2d 174, 177-78 (1992). Because

DAVIDSON v. UNIV. OF N.C. AT CHAPEL HILL

[142 N.C. App. 544 (2001)]

the Commission did not make findings or conclusions as to whether any or all of the alleged omissions of defendant breached this duty of care, it must now do so. In determining whether defendant breached this duty, the circumstances to be considered include, but are not limited to, plaintiff's age, plaintiff's skill level, and the age and skill level of all the JV squad members. *See Fisher v. Northwestern State University*, 624 So.2d 1308 (La.App. 3 Cir.1993), *cert. denied*, 631 So.2d 452 (La.1994) (holding that the special relationship between a school and a student cheerleader required the school to provide supervision that was reasonable and commensurate with the age of the student and the attendant circumstances).

Careful consideration should also be given to the various alleged omissions, articulated by plaintiff throughout the record, which may have constituted negligence on the part of defendant. These omissions include, but are not necessarily limited to: failure to train in safety techniques and cheerleading skills; failure to provide a coach or supervisor; failure to provide safety equipment (including but not limited to mats); failure to evaluate the skill level of the squad members each year to determine the stunts to be performed; failure to evaluate the physical condition of the squad members before practices and games; failure to institute cheerleading guidelines; and failure to specifically prohibit pyramids above a certain height.

We note that the Order makes no reference to the substance of the expert testimony offered by the parties. In determining the amount of supervision and instruction that would have been reasonable and commensurate with plaintiff's age, plaintiff's skill level, and the attendant circumstances, the Commission should consider the opinions set forth in the testimony of the witnesses qualified to provide an expert opinion. Opinions on the applicable standard of care were offered by Marc A. Rabinoff, Ed.D., Lance Wagers, and Robert Stallings. The Commission indicated in its Order that it considered the testimony of all three witnesses and all objections regarding these witnesses. Although Stallings was not formally tendered as an expert witness during his deposition, the Commission made no indication that any of the testimony offered by these witnesses was excluded, and, therefore, we presume that the Commission found all three witnesses to be qualified to provide expert opinions on the applicable standard of care. *See State v. White*, 340 N.C. 264, 293-94, 457 S.E.2d 841, 858, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995) (holding that formal tendering of witness as expert is not required and that trial court's finding as to a witness' qualification to

testify as an expert is implicit in court's admission of testimony). Furthermore, we presume defendant would not dispute that Stallings is qualified to render an expert opinion, since UNC employed Stallings as the coach of the UNC at Wilmington cheerleading squad for two years in 1988-89 and 1989-90.

IV.

[2] We have addressed defendant's affirmative duty, arising from the special relationship between the parties, to provide that degree of care which a reasonable and prudent person would exercise under the same or similar circumstances. In addition, the undisputed evidence shows that defendant voluntarily undertook to advise and educate the cheerleaders regarding safety. We believe that this "voluntary undertaking" by defendant established a separate duty of care owed to plaintiff as a matter of law, independent of the duty of care arising from the special relationship.

The voluntary undertaking theory has been consistently recognized in North Carolina, although it is not always designated as such. *See Pinnix*, 242 N.C. at 362, 87 S.E.2d at 897 (recognizing that a duty of care "may arise generally by operation of law under application of the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care"); *Davidson and Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 666, 255 S.E.2d 580, 584, *disc. review denied*, 298 N.C. 295, 259 S.E.2d 911 (1979) (recognizing that "[t]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm and calls a violation of that duty negligence"). The undertaking theory has been described as follows:

> Akin to the special relationship exceptions is the "undertaking" theory implicated when a defendant voluntarily "undertakes" to provide needed services to the plaintiff when otherwise she would have no obligation. The agreement may arise from a binding contract between the parties or from a gratuitous promise, unenforceable in contract.

Logan § 2.20, at 27. Furthermore, the voluntary undertaking doctrine has been applied in other jurisdictions under similar circumstances. *See Furek v. University of Delaware*, 594 A.2d 506 (Del.1991) (holding that, pursuant to Restatement (Second) of Torts § 323, a university may be liable for a student's injuries during fraternity hazing

activities when the university knows of the dangers involved in such activities and undertakes to regulate the activities).

Here, defendant has acknowledged that it assumed certain responsibilities with regard to teaching the cheerleaders about safety. Dean Boulton testified: "Our position, in terms of extracurricular activities and our student activities, is to advise and educate. We have never been in a position where we were enforcing on any student group unless they were breaking the law. Our job was to present this information and instruct them." Boulton further explained that "the University['s] responsibility for student activities is to provide them with the information that they need relative to safety."

Furthermore, the conduct of various employees of the university implicitly establishes that the university had undertaken to advise and educate the cheerleaders regarding safety. For example, Schroeder's 29 April 1981 letter to the coach of the cheerleading squad stated that he felt multi-level pyramids should be prohibited due to the danger to participants. Schroeder's 25 August 1981 letter to the co-captains of the varsity cheerleading squad urged them to adopt certain safety guidelines, and his letter in February of 1982 to the varsity squad expressed his belief that the squad had agreed to abide by particular safety guidelines. In addition, Schroeder acknowledged receiving the letter from the Assistant Athletic Director at UNC, asking Schroeder to "take charge of any future decisions with regard to the safety and well-being" of the cheerleading squads. Boulton received a copy of each and every letter discussed herein regarding cheerleading safety, and the absence of any documented objection by Boulton in response to these letters evidences an implicit approval of the university's undertaking to address this issue. Furthermore, Boulton testified that the school, through Schroeder and the Department of Student Affairs, had the responsibility to insure that the information regarding cheerleading safety, contained in Schroeder's 29 April 1981 letter to the cheerleading coach, was communicated to the cheerleading squads.

In sum, the evidence is uncontroverted that defendant voluntarily undertook to advise and educate cheerleaders in regard to safety. Therefore, we hold that defendant owed plaintiff a duty of care upon which a claim of negligence may be based, independent of the duty arising from the special relationship between the parties. Because the Commission failed to identify this duty of care arising from defendant's voluntary undertaking, the Commission did not specifically

address whether defendant breached this duty, and upon remand the Commission must do so.

## V.

The order of the Industrial Commission denying plaintiff's claim is reversed, and we remand to the Commission for further consideration of the evidence. *See Bailey v. Dept. of Mental Health*, 272 N.C. 680, 684, 159 S.E.2d 28, 31 (1968) (remanding case to Industrial Commission to consider evidence "in its true legal light" because factual findings of Commission occurred under a "misapprehension of law"). On remand, the Commission must reconsider the evidence in light of our holding that, because of the special relationship between the parties, defendant owed plaintiff an affirmative duty to exercise that degree of care which a reasonable and prudent person would exercise under the same or similar circumstances. The Commission then must find all facts pertinent to this issue, and determine whether defendant, through any of its named agents, breached this duty.

In addition, the Commission must reconsider the evidence in light of our holding that defendant voluntarily undertook, and was therefore legally obligated, to advise and educate the JV squad members regarding safety. The Commission must find all facts pertinent to this issue, and determine whether defendant, through any of its named agents, breached this duty. Should the Commission find and conclude that defendant breached either or both of these duties to plaintiff, it must proceed to make findings and conclusions as to proximate cause, contributory negligence, assumption of risk, and whether any omission by defendant constituted willful and wanton conduct.

Reversed and remanded.

Chief Judge EAGLES and Judge SMITH concur.