Stone St. Partners, LLC v. The Estate of Richard C. Siskey, 2018 NCBC 75.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 17 CVS 15265 |

STONE STREET PARTNERS, LLC,
f/k/a Siskey Capital, LLC; PAUL G.
PORTER; and DAWN E. KING,

       Plaintiffs,

v.

F. LANE WILLIAMSON,
ADMINISTRATOR FOR THE
ESTATE OF RICHARD C. SISKEY;
DIANE M. SISKEY;
METROPOLITAN LIFE
INSURANCE COMPANY; and MSI
FINANCIAL SERVICES, INC. f/k/a
METLIFE SECURITIES, INC.,

       Defendants.

**ORDER AND OPINION ON DIANE
SISKEY'S AND THE METLIFE
DEFENDANTS' MOTIONS
TO DISMISS**

1.    **THIS MATTER** is before the Court on (i) Defendant Diane M. Siskey's ("Diane Siskey") Motion to Dismiss Plaintiffs' Amended Complaint (the "Siskey Motion") and (ii) Defendants Metropolitan Life Insurance Company and MSI Financial Services, Inc. f/k/a MetLife Securities, Inc.'s (collectively, the "MetLife Defendants") Motion to Dismiss Plaintiffs' Amended Complaint (the "MetLife Motion") (collectively with the Siskey Motion, the "Motions") in the above-captioned matter.

2.    After considering the Motions, the parties' briefs in support of and in opposition to the Motions, and the arguments of counsel at the April 4, 2018 hearing on the Motions, the Court hereby **GRANTS** the Motions and dismisses Plaintiffs' claims against Diane Siskey and the MetLife Defendants with prejudice.

*Nexsen Pruet, PLLC, by James C. Smith, Kathleen D. B. Burchette, and Samantha K. Lloyd, for Plaintiffs Stone Street Partners, LLC f/k/a Siskey Capital, LLC, Paul G. Porter, and Dawn E. King.*

*Alston & Bird LLP, by Thomas G. Walker, Matthew P. McGuire, and Caitlin Counts, for Defendant Diane M. Siskey.*

*Parker, Poe, Adams & Bernstein LLP, by Charles E. Raynal, IV and Stephen V. Carey, and Morgan, Lewis & Bockius LLP, by Amy J. Greer and John A. Vassallo, III, for Defendants Metropolitan Life Insurance Company and MSI Financial Services, Inc. f/k/a MetLife Securities, Inc.*

*Tin, Fulton, Walker & Owen, PLLC, by F. Lane Williamson, for Defendant F. Lane Williamson, Administrator for the Estate of Richard C. Siskey.*

Bledsoe, Chief Judge.

## I.

## FACTUAL BACKGROUND

3.     The Court does not make findings of fact when ruling on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). Rather, the Court recites the relevant allegations in the pleading asserting the challenged claims—here, Plaintiffs' Amended Complaint.

4.     This case is one of many lawsuits and claims arising out of several alleged Ponzi schemes[1] operated by Charlotte, North Carolina businessman Richard C. Siskey ("Rick Siskey") for a number of years prior to his death on December 28, 2016.[2]

5.     Plaintiffs Paul G. Porter ("Porter") and Dawn E. King ("King") were business associates of Rick Siskey and his wife, Diane Siskey (together, the "Siskeys"), in Plaintiff Stone Street Partners, LLC (f/k/a Siskey Capital, LLC) ("Siskey Capital," "Stone Street," or the "Company"), a private equity firm based in Charlotte, North Carolina.  From early 2015 until April 1, 2017, Porter was a managing director, business advisor, and consultant for Stone Street.  King served as Stone Street's Chief Financial Officer from early 2015 through at least the date of the Amended Complaint.  (Am. Compl. ¶ 12.)

---

[1] "A Ponzi scheme is a scam whereby early investors are paid returns from money contributed by later investors in order to entice more investors." *Blyth v. McCrary*, 184 N.C. App. 654, 657 n.1, 646 S.E.2d 813, 815 n.1 (2007); *see also United States v. Loayza*, 107 F.3d 257, 259 n.1 (4th Cir. 1997) (defining "Ponzi scheme" as a form of fraud "in which early investors are paid off with money received from later investors to prevent discovery and to encourage additional and larger investments"); Ponzi Scheme, *Oxford English Dictionary* (2013) ("form of fraud in which belief in the success of a non-existent enterprise is fostered by payment of quick returns to first investors using money invested by others").

[2] *See, e.g.*, *In re WSC Holdings, LLC*, Petition No. 17-30338 (Bankr. W.D.N.C), *In re SouthPark Partners, LLC*, Petition No. 17-30339 (Bankr. W.D.N.C.), *In re TSI Holdings, LLC*, No. 17-30132 (Bankr. W.D.N.C.); *Robinson v. Estate of Richard C. Siskey*, 2017 CVS 5843 (Mecklenburg County, N.C. Super. Ct.); *Aldridge v. Metropolitan Life Ins. Co.*, 2018 CVS 1050 (Union County, N.C. Super. Ct.); *Aldridge v. Metropolitan Life Ins. Co.*, 2018 CVS 1124 (Union County, N.C. Super. Ct.); *Kelly v. Metropolitan Life Ins. Co.*, 2018 CVS 4978 (Guilford County, N.C. Super. Ct.); *Peterson v. Metropolitan Life Ins. Co.*, 2018 CVS 528 (Lincoln County, N.C. Super. Ct.); *Williams v. Metropolitan Life Ins. Co.*, 2018 CVS 307 (Yadkin County, N.C. Super. Ct.); *Goulet v. Metropolitan Life Ins. Co.*, 2018 CVS 12201 (Mecklenburg County, N.C. Super. Ct.).  Each of the North Carolina state court cases listed above has been designated as a complex business case by the Chief Justice of the Supreme Court of North Carolina and is pending before the undersigned.

6.      Plaintiffs allege that "[a]fter [Rick] Siskey began work for [the MetLife Defendants], he formed a series of limited liability companies, which he used to establish and implement several elaborate Ponzi schemes." (Am. Compl. ¶ 24, ECF No. 50.) According to Plaintiffs, Rick Siskey fraudulently induced his clients to invest vast sums in his Ponzi schemes, and rather than invest his clients' funds in legitimate investments, he transferred the invested funds to "the Siskeys' personal accounts" to "pay for the Siskeys' lavish personal lifestyle, to pay Rick Siskey's huge gambling debts, and to pay other investors when they sought the return of their money." (Am. Compl. ¶ 25.) Plaintiffs allege that during the fifteen years preceding his death, Rick Siskey's Ponzi schemes "defrauded investors of over $35 million." (Am. Compl. ¶ 2.)

7.      Plaintiffs further allege that Rick Siskey induced Porter and King to leave "lucrative and prestigious professional practices"[3] to join Siskey Capital "in reliance on [Rick] Siskey's representations of acumen and success." (Am. Compl. ¶ 3A.)[4] According to Plaintiffs, during his attempts to recruit Porter and King, Rick Siskey never disclosed that he was engaged in fraudulent schemes to defraud his clients and instead "touted his reputation and success as a MetLife broker and his status as a philanthropist and a pillar of the Charlotte community." (Am. Compl. ¶ 3A.) Although alleging that Siskey Capital "was and still is a legitimate business, with

---

[3]  Prior to joining Stone Street, Porter was a corporate partner in the law firm of McGuireWoods LLP, and King, a certified public accountant, had a successful solo accounting practice. Both worked in Charlotte. (Am. Compl. ¶¶ 58, 59.) Porter is now a lawyer in solo practice in Charlotte. (Am. Compl. ¶ 11.)

[4]  The Amended Complaint contains two paragraphs labeled with the number "3." For citation purposes, the first paragraph shall be designated herein as "3A" and the second paragraph shall be designated as "3B."

real assets, real investments, audited financial statements, and an honest business purpose," (Am. Compl. ¶ 55), Plaintiffs assert that the "taint of [Rick] Siskey's fraud caused a loss of client confidence that effectively destroyed the Company," (Am. Compl. ¶ 3B).

8. According to Plaintiffs, the MetLife Defendants were "reaping millions of dollars from [Rick] Siskey's sale of [their] financial and insurance products" and, "[t]o protect those revenues, [the] MetLife [Defendants] turned a blind eye to Siskey's repeated brushes with regulators and unorthodox business practices which should have alerted [the MetLife Defendants to] the frauds being carried out under [their] very nose, and under [the] MetLife umbrella." (Am. Compl. ¶ 4.) As alleged, the MetLife Defendants "simply ignored the red flags and allowed Siskey to operate under [their] imprimatur in order to protect [their] substantial revenues flowing from Siskey's operations." (Am. Compl. ¶ 7.) Although Plaintiffs do not allege that they were customers or clients of the MetLife Defendants or that they ever had any business or contract relationship with them, Plaintiffs contend that the MetLife Defendants had a duty to protect Plaintiffs from Rick Siskey's fraud and thus are liable for Plaintiffs' alleged losses.

9. Plaintiffs further aver that Diane Siskey "was integrally involved in the operation, finances and day-to-day management of all [Rick] Siskey's enterprises, both legal and illegal," (Am. Compl. ¶ 4), and "worked hand in glove with [Rick] Siskey in all his business endeavors," (Am. Compl. ¶ 8). According to Plaintiffs, from 2001 until late 2016, Diane Siskey was employed by the MetLife Defendants, held various

insurance and securities licenses under state and federal law, and was responsible for the MetLife Defendants' regulatory compliance functions in North and South Carolina. Plaintiffs contend that Diane Siskey "did far more than turn a blind eye" to Rick Siskey's Ponzi schemes; rather, Plaintiffs allege that "she actively participated in her husband's schemes and the [various] Ponzi [e]ntities," (Am. Compl. ¶ 40), and thus is liable to Plaintiffs' for their alleged injuries.

10. On or about December 12, 2016, the Federal Bureau of Investigation ("FBI") seized Rick Siskey's assets and publicly disclosed Rick Siskey's alleged Ponzi schemes. (Am. Compl. ¶ 61.) Plaintiffs aver that they had no knowledge of Rick Siskey's illegal activities until the asset seizure and were "completely blindsided" by the FBI's disclosures. (Am. Compl. ¶ 62.) Plaintiffs assert that "as a direct and proximate result of Rick Siskey's fraudulent Ponzi scheme activities, (i) [Porter's and King's] present and future business prospects have been devastated," (Am. Compl. ¶ 76), (ii) their "reputation and employability in the Charlotte business and professional communities have been [irretrievably damaged]," (Am. Compl. ¶¶ 78, 79), and (iii) "the business of Stone Street Partners has been destroyed," forcing Plaintiffs to wind up the Company, (Am. Compl. ¶ 77).

## II.

## PROCEDURAL BACKGROUND

11. Plaintiffs initiated this action on August 22, 2017, asserting claims against Diane Siskey, the MetLife Defendants, and Defendant F. Lane Williamson in his capacity as the Administrator for the Estate of Richard C. Siskey (the "Estate"). The

case was thereafter designated a mandatory complex business case under N.C. Gen. Stat. § 7A-45.4(a) by order of Chief Justice Mark R. Martin and assigned to the undersigned.

12. Upon proper motion, the Court permitted Plaintiffs to file an Amended Complaint on January 22, 2018. In the Amended Complaint, Plaintiffs contend that "[a]s a result of [Rick] Siskey's financial crimes, and the concealment of his illegal activities, Plaintiffs have suffered substantial monetary losses, as well as the loss of their business and professional reputations." (Am. Compl. ¶ 2.) Of particular relevance to the Motions, Plaintiffs asserted claims against Diane Siskey for breach of fiduciary duty and constructive fraud and against Diane Siskey and the MetLife Defendants for negligence and aiding and abetting breach of fiduciary duty.[5] Diane Siskey and the MetLife Defendants each moved to dismiss the claims asserted against them through separate motions filed on February 26, 2018.[6]

13. The Court held a hearing on the Motions on April 4, 2018, at which all parties were represented by counsel. The Court stayed the initiation of discovery pending the Court's resolution of the Motions.

14. The Motions are now ripe for resolution.

---

[5] The Amended Complaint also sets forth claims against the Estate for breach of fiduciary duty, constructive fraud, breach of contract, fraud, unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, and interference with prospective economic relations.

[6] The Estate filed its Answer to the Amended Complaint on February 20, 2018. The Estate did not file a motion to dismiss and is not a party to either of the Motions.

## III.

## LEGAL STANDARD

15. In deciding a Rule 12(b)(6) motion, the Court's inquiry is "whether the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Enoch v. Inman*, 164 N.C. App. 415, 417, 596 S.E.2d 361, 363 (2004); *see Sutton v. Duke*, 277 N.C. 94, 98–99, 176 S.E.2d 161, 163 (1970). The Court views the facts pleaded and permissible inferences in a light most favorable to the non-moving party. *Goodman v. Holmes & McLaurin*, 192 N.C. App. 467, 473, 665 S.E.2d 526, 531 (2008). The Court is not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. HHS, Div. of Facility Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005).

16. In addition, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers[.]" *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001). Dismissal under Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985).

IV.

ANALYSIS

17.    As noted above, Plaintiffs assert claims against Diane Siskey for breach of fiduciary duty and constructive fraud and against Diane Siskey and the MetLife Defendants for negligence and aiding and abetting breach of fiduciary duty.  The moving Defendants seek the dismissal of each of these claims.

A.    Negligence Against Diane Siskey and the MetLife Defendants Based on a Special Relationship

18.    Plaintiffs contend that the MetLife Defendants and Diane Siskey (i) "owed a duty to Plaintiffs, to protect them from the illegal, fraudulent and rogue behavior engaged in by Rick Siskey," (Am. Compl. ¶ 82), (ii) "had a duty and the ability to effectively supervise and control the activities of Rick Siskey to ensure that he complied with the rules and regulations of [the MetLife Defendants] and to ensure that he complied with the laws applicable to him as an agent and broker working for [the MetLife Defendants]," (Am. Compl. ¶ 83), and (iii) "flagrantly breached their duties of care by turning a blind eye toward and failing to investigate and prevent Rick Siskey's illegal and fraudulent conduct," (Am. Compl. ¶ 89), thereby causing Plaintiffs to "suffer serious and irreversible damage," (Am. Compl. ¶ 90).

19.    "To state a claim for common law negligence, a plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006).  A negligence claim "necessarily fails if there is no legal duty owed to the

plaintiff by the defendant." *Bridges v. Parrish*, 222 N.C. App. 320, 324, 731 S.E.2d 262, 265 (2012).

> The duty may arise specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to endanger the person or property of others.

*Pinnix v. Toomey*, 242 N.C. 358, 362, 87 S.E.2d 893, 897 (1955); *see, e.g.*, *Guthrie v. Conroy*, 152 N.C. App. 15, 25, 567 S.E.2d 403, 411 (2002) ("A duty is defined as an obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks.").

20. "No legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care," and the foreseeability of the plaintiff's injuries "depends on the facts of the particular case." *Stein*, 360 N.C. at 328, 626 S.E.2d at 267–68. "Thus, the preliminary question is whether defendant owed a duty of care to plaintiff under the circumstances." *Davidson v. Univ. of N.C. at Chapel Hill*, 142 N.C. App. 544, 553, 543 S.E.2d 920, 926 (2001). "When there is no dispute as to the facts . . . the issue of whether a duty exists is a question of law for the court." *Mozingo v. Pitt Cty. Mem'l Hosp., Inc.*, 101 N.C. App. 578, 588, 400 S.E.2d 747, 753 (1991), *aff'd*, 331 N.C. 182, 415 S.E.2d 341 (1992).

21. The MetLife Defendants and Diane Siskey each contend that, on the facts alleged, they did not owe a duty to Plaintiffs on which a negligence claim may be based. The Court agrees.

22.     Plaintiffs' negligence claims posit that Diane Siskey and the MetLife Defendants each owed a duty to Plaintiffs to prevent Rick Siskey from causing harm to Plaintiffs through his tortious conduct.  Our appellate courts have held, however, that "[i]n general, there is neither a duty to control the actions of a third party, nor to protect another from a third party."  *Scadden v. Holt*, 222 N.C. App. 799, 802, 733 S.E.2d 90, 92 (2012); *accord Harris v. DaimlerChrysler Corp.*, 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006) ("Generally, there is no duty to take action to prevent the tortious conduct of third persons against the injured party."); *Hall v. Toreros, II, Inc.*, 176 N.C. App. 309, 325, 626 S.E.2d 861, 871 (2006) (to similar effect).

23.     There are exceptions to this general rule, however, "arising typically when the defendant has a special relationship to the plaintiff or to the tortfeasor."  *Harris*, 180 N.C. App. at 555–56, 638 S.E.2d at 265.  As explained by our Court of Appeals:

> A special relationship between the defendant and the tortfeasor imposes a duty upon the defendant to control the tortfeasor's conduct, or a special relationship between the defendant and the injured party gives the injured party a right to protection.  In such event, there is a duty upon the actor to control the tortfeasor's conduct, and to guard other persons against his dangerous propensities.  Some recognized examples of special relationships include: (1) parent-child; (2) master-servant; (3) landowner-licensee; (4) custodian-prisoner; and (5) institution-involuntarily committed mental patient.  In each example, the chief factors justifying imposition of liability are 1) the ability to control the person and 2) knowledge of the person's propensity for violence.

*Id.* at 556, 638 S.E.2d at 265 (citations and quotation marks omitted); *see, e.g.*, *Hedrick v. Rains*, 121 N.C. App. 466, 469, 466 S.E.2d 281, 283 (1996) (to similar effect); *King v. Durham Cty. Mental Health Developmental Disabilities & Substance Abuse Auth.*, 113 N.C. App. 341, 345–46, 439 S.E.2d 771, 774 (1994) (to similar effect).

24. Significantly for this case, the North Carolina courts have declined to hold that a special relationship exists between spouses as a matter of law. *See, e.g., Shoe v. Hood*, 251 N.C. 719, 724, 112 S.E.2d 543, 548 (1960) ("A husband is not the agent of his wife merely because of the marital relationship and neither a husband or wife is ordinarily responsible for the torts of the other."). Thus, Diane Siskey does not have a special relationship with Rick Siskey based simply on their marital relationship.

25. To invoke the exception to the general rule here, Plaintiffs have sought to plead the existence of a special relationship with each of the moving Defendants as follows:

> 86. [The MetLife Defendants] had a special relationship with [their] agent and employee, Rick Siskey, and knew or had reason to know of his dangerous propensities, which imposed upon [the MetLife Defendants] a duty to control Siskey's conduct and to protect others, including Plaintiffs, from harm resulting from the Siskey's [sic] illegal activities engaged in under the MetLife aegis.
>
> 87. By virtue of her roles as Risk Siskey's supervisor and wife, Diane Siskey had a special relationship with Rick Siskey and knew of his dangerous, fraudulent propensities, which imposed upon Diane Siskey a duty to control Rick Siskey's conduct and to protect others, including Plaintiffs, from harm resulting from Siskey's illegal activities engaged in the MetLife aegis.
>
> 88. Diane Siskey also had a special relationship with Siskey Capital, LLC, which imposed upon her a duty to protect Siskey Capital and its principals from harm resulting from Rick Siskey's illegal activities as engaged in under the MetLife aegis.

(Am. Compl. ¶¶ 86–88.)

26. The Court concludes that Plaintiffs' allegations are insufficient to sustain their negligence claims against either Diane Siskey or the MetLife Defendants as a matter of law.

27. The Supreme Court of North Carolina has held that "for common law negligence purposes, no special relationship exists between a defendant and a third person unless (1) the defendant knows or should know of the third person's violent propensities and (2) the defendant has the ability and opportunity to control the third person at the time of the third person's criminal acts." *Stein*, 360 N.C. at 330, 626 S.E.2d at 269; *accord Harris*, 180 N.C. App. at 556, 638 S.E.2d at 265 ("[T]he chief factors justifying imposition of liability are 1) the ability to control the person and 2) knowledge of the person's propensity for violence."); *Hedrick*, 121 N.C. App. at 469, 466 S.E.2d at 284 (reversing denial of Rule 12(c) motion where "the complaint alleges no facts from which it may be inferred that [the third party] possessed . . . violent propensities, or that, if he did, defendant . . . knew or had any reason to know of those propensities" and citing Restatement (Second) of Torts § 315); *see* Restatement (Second) of Torts § 315 (Am. Law Inst. 1965) (providing general principles for a duty to prevent a third party "from causing *physical harm* to another" (emphasis added)).

28. The moving Defendants contend that the special relationship exception, as recognized in North Carolina, is limited to situations involving physical harm or bodily injury and that, because Plaintiffs have only pleaded economic loss, the special relationship exception does not apply. Plaintiffs argue in response that a special relationship justifying the imposition of liability for conduct of a third party is not

limited to situations involving physical harm and that, in any event, Plaintiffs have pleaded sufficient facts from which a factfinder could reasonably conclude that the moving Defendants each owed Plaintiffs a duty to protect Plaintiffs from Rick Siskey's illegal activities.

29. It does not appear that any North Carolina appellate court has expressly declared that a special relationship for common law negligence purposes only exists where a plaintiff has suffered physical harm or bodily injury. That said, the parties have not cited, and the Court's research has not identified, any North Carolina appellate decisions finding the existence of a special relationship in circumstances other than those in which the plaintiff was alleged to have suffered a physical injury. *See, e.g.*, *Harris*, 180 N.C. App. at 552–53, 638 S.E.2d at 263 (death and injuries from auto accident); *Scadden*, 222 N.C. App. at 800, 733 S.E.2d at 91 (back injuries from restrained patient); *Hedrick*, 121 N.C. App. at 469–70, 466 S.E.2d at 283–84 (murder); *King*, 113 N.C. App. at 342, 439 S.E.2d at 772 (death by shooting); *see also, e.g.*, *Stein*, 360 N.C. at 324, 626 S.E.2d at 265 (injury by shooting).

30. Although Plaintiffs argue that this Court recognized "a limited duty arising from a special relationship, despite the fact that the claimants suffered pecuniary, not physical, injury," (Mem. Law Opp'n Diane Siskey's Mot. Dismiss 12, ECF No. 64), in *Bradshaw v. Maiden*, 2015 NCBC LEXIS 80 (N.C. Super. Ct. Aug. 10, 2015), the *Bradshaw* case involved a substantively different claim—gross negligence rather than common law negligence—and the claim was not based on an alleged duty to control the actions of a third party or to protect another from a third party as

Plaintiffs allege here. Rather, in *Bradshaw*, the Court held that the defendant—which was acting under contract and was alleged to have willfully and knowingly forwarded information to plaintiffs that the defendant knew was false or inaccurate and upon which it knew plaintiffs would rely to their detriment—had a general duty of care under the law to refrain from sending knowingly false information so "as not to injure another" in those circumstances. *Bradshaw*, 2015 NCBC LEXIS 80, at *21–22; *see, e.g., Olympic Prods. Co., Div. of Cone Mills Corp. v. Roof Sys., Inc.,* 88 N.C. App. 315, 323, 363 S.E.2d 367, 372 (1988) ("This duty to protect third parties from harm arises under circumstances where the party is in a position so that 'anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to the person or property of the other.'"). As such, *Bradshaw* involved a defendant's affirmative act that harmed a third party, not, as here, a defendant's failure to prevent harm caused by a third party. *Bradshaw* is thus inapposite to the issue under review.

31. Significant to the current inquiry is the fact that North Carolina's reported decisions examining the special relationship exception derive directly, or rely upon decisions that derive directly, from the Restatement (Second) of Torts § 315 and its related provisions,[7] which recognize that the special relationship exception is in derogation of the general principle that "[t]here is no duty so to control the conduct of

---

[7] See, for example, Restatement (Second) of Torts § 319, titled "Duty of Those in Charge of Person Having Dangerous Propensities," which applies to a defendant who fails to "take[] charge of a third person to whom he knows or should know to be likely to cause *bodily harm* to other if not controlled[.]" Restatement (Second) of Torts § 319 (emphasis added).

a third person so as to prevent him from causing *physical harm* to another." Restatement (Second) of Torts § 315 (emphasis added); *see, e.g.*, *Davidson*, 142 N.C. App. at 555, 543 S.E.2d at 927; *Hedrick*, 121 N.C. App. at 469–70, 466 S.E.2d at 283–84; *King*, 113 N.C. App. at 345–46, 439 S.E.2d at 774–75 (citing cases); *see also, e.g.*, *Bridges*, 366 N.C. at 542, 742 S.E.2d at 797. Considering the Restatement together with the Supreme Court's determination that a defendant's knowledge of "the third person's *violent propensities*" is a necessary finding for application of the exception, *Stein*, 360 N.C. at 330, 626 S.E.2d at 269 (emphasis added), it appears to the Court that our appellate courts intend the special relationship exception to apply only where the plaintiff has suffered physical harm or bodily injury.

32. Here, Plaintiffs do not allege that Rick Siskey had a propensity for violence or caused Plaintiffs physical harm, much less that Plaintiffs suffered physical harm or that the moving Defendants knew or should have known of any of Rick Siskey's purported "violent propensities." As a result, the Court concludes that, as alleged, Defendants do not fall within the special relationship exception to the general common law negligence rule that "there is neither a duty to control the actions of a third party, nor to protect another from a third party." *Scadden*, 222 N.C. App. at 802, 733 S.E.2d at 92.

33. The Court further concludes that, even if the Court were to find that the special relationship exception could apply in circumstances without physical harm or injury, Plaintiffs have failed to allege facts showing that Defendants had the "ability to control" Rick Siskey sufficient to permit the application of the exception here. *See,*

*e.g.*, *Stein*, 360 N.C. at 330, 626 S.E.2d at 269 (holding that a defendant owes a duty to control the actions of a third party where "the defendant has the ability and opportunity to control the third person at the time of the third person's criminal acts").

34. Although Plaintiffs repeatedly allege that Defendants had a duty to control Rick Siskey's conduct and ensure his compliance with the MetLife Defendants' rules and regulations and applicable law, (Am. Compl. ¶¶ 83, 86, 87), Plaintiffs allege only in a conclusory fashion that either Diane Siskey or the MetLife Defendants had the ability, rather than the duty, to control Rick Siskey's actions, (Am. Compl. ¶ 83). How Defendants had the ability to control Rick Siskey and how that alleged control could have been exercised by Defendants to prevent Rick Siskey from engaging in his Ponzi schemes, the public disclosure of which allegedly caused Plaintiffs' injuries, is left unpleaded.

35. The most Plaintiffs plead to tie Defendants' exercise of alleged control to the prevention of Plaintiffs' alleged harm is their allegation that "[i]f [the MetLife Defendants] had maintained proper internal controls and conducted a proper investigation . . . Siskey's Ponzi scheme would have been detected and stopped." (Am. Compl. ¶ 31.) Not only is Diane Siskey absent from this allegation, but the allegation itself smacks more of "supervision" than "control" and is nonetheless built upon a chain of attenuated inferences that the Court concludes are too speculative and conjectural to sustain Plaintiffs' claim for negligence. *See, e.g.*, *Kingsdown, Inc. v.*

*Hinshaw*, 2015 NCBC LEXIS 30, at *26 (N.C. Super. Ct. Mar. 25, 2015) (dismissing claim based on "speculative and conjectural" allegations under Rule 12(b)(6)).

36. Accordingly, for this separate and independent reason, the Court concludes that Plaintiffs have failed to plead facts permitting the application of the special relationship exception to create the legal duty on which Plaintiffs seek to base their claim for negligence.

B. Negligence Against Diane Siskey and the MetLife Defendants Based on a MetLife Corporate Code of Conduct

37. Plaintiffs also contend that the MetLife Defendants' corporate codes of conduct imposed a legal duty running from Diane Siskey and the MetLife Defendants to Plaintiffs. North Carolina law is clear, however, that while internal corporate policies may be some evidence of alleged negligence, they are "irrelevant to the question of whether a legal duty [is] owed." *Hall*, 176 N.C. App. at 317, 626 S.E.2d at 867. Accordingly, the Court concludes that the MetLife Defendants' corporate codes of conduct do not create a legal duty on which Plaintiffs' negligence claims may be sustained.

C. Negligence Against the MetLife Defendants Based on Negligent Retention and Supervision

38. To the extent Plaintiffs seek to advance a negligent retention and supervision claim against the MetLife Defendants, Plaintiffs' claim fails because Plaintiffs have not alleged a nexus or causal connection between Rick Siskey's employment relationship with the MetLife Defendants and Plaintiffs' alleged injury. *See, e.g.*, *Little v. Omega Meats I, Inc.*, 171 N.C. App. 583, 589, 615 S.E.2d 45, 49

(requiring plaintiff advancing a negligent retention and supervision claim to show "a nexus between the employment relationship and the injury"), *aff'd*, 360 N.C. 164, 622 S.E.2d 494 (2005).

39. Here, Plaintiffs do not allege that they had a business, contractual, or other relationship with the MetLife Defendants. Nor do Plaintiffs allege that the Siskeys took action in the Siskeys' capacities as employees or representatives of the MetLife Defendants to harm Plaintiffs, that the MetLife Defendants made any misrepresentations to, or concealed material facts from, Plaintiffs, or that the Siskeys caused Plaintiffs to believe that they were doing business with the MetLife Defendants when they did business with either Siskey. Neither do Plaintiffs allege that the MetLife Defendants knew of Rick Siskey's Ponzi schemes or ratified his conduct nor allege any nexus between Diane Siskey's role in Stone Street and her relationship with the MetLife Defendants.

40. Rather, Plaintiffs allege that (i) "[t]he support of [the MetLife Defendants] was essential to the establishment of [Rick] Siskey's new business operations," through the lease of space and the provision of office furnishings and office staff, (Am. Compl. ¶ 22), (ii) the MetLife Defendants "provided [Rick] Siskey with the established and trusted MetLife brand," by permitting him to use MetLife "signage, . . . stationery, business cards[,] and other marketing materials" and "to sell MetLife insurance products, annuities and other MetLife products," (Am. Compl. ¶ 22), (iii) the "MetLife brand gave [Rick] Siskey's operation stature and credibility throughout the Charlotte insurance and financial services marketplace" and "access

to the investors he needed for his Ponzi schemes," (Am. Compl. ¶ 22), (iv) after Rick Siskey began working for the MetLife Defendants under the name Wall Street Capitol and selling MetLife products, he established the LLCs that he used in his alleged Ponzi schemes, (Am. Compl. ¶¶ 23–24), (v) the MetLife Defendants did not investigate Rick Siskey's activities after his 2004 NASD suspension for selling high risk promissory notes issued by two of the Ponzi scheme entities without disclosing his participation (although MetLife Securities terminated his affiliation as a registered representative at that time in response to the suspension), (Am. Compl ¶ 27), (vi) the MetLife Defendants did not meaningfully investigate Rick Siskey's activities after his 2011 ERISA violation and NASD fine for investing employee benefit plan assets in these same Ponzi scheme entities, (Am. Compl ¶¶ 29–33), (vii) despite his disciplinary record, the MetLife Defendants reinstated Rick Siskey as a MetLife affiliated broker in 2013 and permitted him to sell MetLife products, (Am. Compl. ¶ 33), and (viii) the MetLife Defendants initiated but quickly terminated an investigation of the Siskeys' insurance activities in 2015, (Am. Compl. ¶ 34).

41. At their core, Plaintiffs' allegations against the MetLife Defendants are premised on the MetLife Defendants' decisions in 2004, 2011, 2013, and 2015 to permit Rick Siskey to continue to associate himself with the MetLife brand. These allegations are not based on any direct relationship between Plaintiffs and the MetLife Defendants or on any specific conduct Rick Siskey directed against Plaintiffs while acting as an agent of the MetLife Defendants. As pleaded, Plaintiffs' claimed injury arises not from Rick Siskey's alleged misconduct, but rather from the alleged

negative perception among investors and persons in the Charlotte community concerning Plaintiffs' relationship with, and connection to, Rick Siskey, resulting from the public disclosure of Rick Siskey's Ponzi schemes.

42. As such, Plaintiffs' allegations, taken as true, fail to show a nexus or causal connection between Rick Siskey's relationship with the MetLife Defendants—and the MetLife Defendants' alleged failure to act against Rick Siskey—and the reputational harm and pecuniary loss Plaintiffs seek to recover arising from the public disclosure of Rick Siskey's alleged Ponzi schemes in December 2016 and the resulting demise of his Ponzi scheme entities. Without that nexus, and in the absence of a legally recognized special or other relationship giving rise to a legal duty owing to Plaintiffs from the MetLife Defendants, Plaintiffs' negligent retention and supervision claim against the MetLife Defendants must necessarily fail for failure to plead a legal duty sufficient to support that claim.[8] *See, e.g.*, *Little*, 171 N.C. App. at 589–90, 615 S.E.2d at 50 (requiring nexus).

D. <u>Negligence Against Diane Siskey Based on Breach of Fiduciary Duty</u>

43. Plaintiffs contend that Diane Siskey owed a fiduciary duty to Stone Street to protect Stone Street from Rick Siskey's illegal conduct and that this fiduciary duty

---

[8] The MetLife Defendants also argue that Plaintiffs' negligence claim should be dismissed because reputational harm is generally unavailable in a negligence action, citing *Tyson v. L'Eggs Products, Inc.*, 84 N.C. App. 1, 351 S.E.2d 834 (1987), and cases from other jurisdictions. In light of the Court's dismissal of the negligence claim and Plaintiffs' contention that they seek damages for pecuniary loss in addition to damages for reputational harm, the Court does not find it necessary to address this additional argument at this time.

serves as a legal duty upon which Plaintiffs' negligence claim against her may proceed. The Court disagrees.

44. As an initial matter, Plaintiffs have not alleged that, at the time of the events at issue, Diane Siskey was a manager, officer, director, or company official of Stone Street, or that she had a specific title or a formal position with the Company of any kind. Chapter 57D of the North Carolina General Statutes determines "the rights and duties of interest owners, managers, and other company officials" of limited liability companies organized under North Carolina law. N.C. Gen. Stat. § 57D-1-02. Under Chapter 57D, an LLC's operating agreement "governs the internal affairs of [the] LLC," including the "rights, duties, and obligations of . . . company officials in relation to each other, the LLC, and the interest owners." N.C. Gen. Stat. § 57D-2-30(a). Where Chapter 57D's "default" provisions conflict with an LLC's operating agreement, the operating agreement controls. *See, e.g.*, *Stainless Valve Co. v. Safefresh Techs., LLC*, 231 N.C. App. 286, 291, 753 S.E. 2d 331, 335 (2013) ("'The [LLC] Act contains numerous "default" provisions or rules that will govern an LLC only in the absence of an explicitly different arrangement in the LLC's articles of organization or written operating agreement.'" (quoting Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 34.01 (7th ed. 2012))).

45. Here, the Stone Street Operating Agreement expressly provides, in relevant part, that "[t]he Managers . . . shall have the full right, power and authority to manage the day-to-day business and affairs of the LLC," (Mem. Law Supp. Diane Siskey's Mot. Dismiss Ex. 1, at § 5.1(a) [hereinafter "Operating Agreement"], ECF

No. 56.1), and further, that "no Person (other than a Manager or Officer) shall have the authority to represent, bind or otherwise act on behalf of the LLC," (Operating Agreement § 5.1(c)). Because Diane Siskey is not pleaded to have been a Manager or Officer of Stone Street, the Court concludes that the language of the Operating Agreement does not give rise to a fiduciary duty owing from Diane Siskey to Stone Street.

46. Faced with this fact, and independent of the Operating Agreement, Plaintiffs contend that Diane Siskey owed Stone Street a legal or fiduciary duty as both a "company official" and "*de facto*" officer of Stone Street based on her exercise of authority over the Company in the operation of its business. The Court finds neither contention supported by the pleaded allegations.

47. Plaintiffs allege that Diane Siskey (i) was "actively involved in the business operations of [Stone Street]"; (ii) was "actively involved in [its] day-to-day management"; (iii) "handled all of its leasing and insurance matters, and much of its administrative operations"; (iv) was "actively involved in all aspects of [Stone Street's] interactions with its investors"; (v) "regularly attended" meetings with Stone Street's managers and company officials and "existing and prospective investors" and clients; (vi) was a "key member" of the management "team"; (vii) had to "approve" "virtually all major decisions regarding the corporate governance of Siskey Capital," (Am. Compl. ¶¶ 56–57); (viii) "worked hand in glove with [Rick] Siskey in all his business endeavors," (Am. Compl. ¶ 8); and (ix) "actively participated in her husband's schemes and the [various] Ponzi [e]ntities," (Am. Compl. ¶ 40).

48.     Under Chapter 57D, a "manager" of an LLC owes a fiduciary duty to the LLC, N.C. Gen. Stat. § 57D-3-21, and non-manager "company officials" have the same fiduciary duty as managers, N.C. Gen. Stat. § 57D-3-23.  These duties are spelled out in N.C. Gen. Stat. § 57D-3-21(b).

49.     Chapter 57D defines a "company official" as "[a]ny person exercising any management authority over the limited liability company whether the person is a manager or referred to as a manager, director, or officer or given any other title." N.C. Gen. Stat. § 57D-1-03(5).  Although no North Carolina appellate court has interpreted this definition, Judge Robinson of this Court has recently catalogued relevant definitions of "management" and "authority" in determining whether a person is a "company official" under section 57D-1-03(5):

> The current edition of *Black's Law Dictionary* defines "management" as "[t]he people in an organization who are vested with a certain amount of discretion and independent judgment in managing its affairs" and "[t]he act or system of controlling and making decisions for a business[.]" *Black's Law Dictionary* (10th ed. 2014).  *Webster's Dictionary* defines "management" as "the conducting or supervising of something (such as a business)" and "the collective body of those who manage or direct any enterprise or interest[.]"  *Webster's Third New International Dictionary* 1372 (1981). *Black's Law Dictionary* defines "authority" as "[t]he official right or permission to act" and "the power delegated by a principal to an agent[.]"  *Black's Law Dictionary* (10th ed. 2014).  *Webster's Dictionary* defines "authority" as "delegated power over others" and "freedom granted by one in authority[.]"  *Webster's Third New International Dictionary* 146 (1981).

*Timbercreek Land & Timber Co., LLC v. Robbins*, 2017 NCBC LEXIS 64, at *14 (N.C. Super. Ct. July 28, 2017).

50.     Guided by these definitions here, the Court concludes that Plaintiffs' allegations do not allege facts showing that Diane Siskey exercised management

authority over Stone Street such that a fact finder could conclude that she was a "company official" of Stone Street under N.C. Gen. Stat. § 57D-1-03(5). The activities identified in paragraph 47(i)—(vi) above are the sorts of activities in which many non-officer employees participate and do not permit a conclusion that Diane Siskey was "vested with discretion and independent judgment in managing and operating" Stone Street, *see id.* at *15, or that she "controlled and made decisions" for the Company, *id.* Nor do they show that Diane Siskey was "delegated" or "entrusted" with "authority" or "permission" to act on behalf of the Company as one supervising or controlling the Company. *Id.* In particular, that she was "involved" in Stone Street's "business operations," "day-to-day management," and "interactions with . . . investors," does not permit a conclusion that Diane Siskey *actually exercised* management authority over Stone Street, including by controlling and making decisions for the Company. While the allegations outlined in paragraph 47(i)—(vi) above certainly plead Diane Siskey was "actively involved" in Stone Street's business, the Court concludes that the pleaded facts do not show that she exercised management authority over Stone Street as required under section 57D-1-03(5) to impose upon her a fiduciary duty to Stone Street identical to that owed by Stone Street's managers, directors, and officers.

51. Likewise, Plaintiffs other allegations, as relayed in paragraph 47(vii)—(ix) above, make conclusory assertions that the Court concludes do not show that Diane Siskey exercised management authority over Stone Street. Although Plaintiffs allege Diane Siskey had to "approve . . . virtually all major decisions regarding [Stone

Street's] corporate governance," they do not allege that Diane Siskey made or approved a single decision for Stone Street or that any corporate governance decisions were, in fact, made by the Company with (or without) Diane Siskey's approval. Similarly, that Diane Siskey may have "worked hand in glove with [Rick] Siskey in all his business endeavors," as Plaintiffs allege, does not equate to her exercising management authority over Stone Street sufficient to satisfy section 57D-1-03(5). Finally, that Diane Siskey may have allegedly participated in Rick Siskey's Ponzi schemes, as Plaintiffs variously contend, provides no support for Plaintiffs' contention that she exercised management authority over Stone Street.

52. As such, the Court concludes that Plaintiffs have failed to allege facts showing that Diane Siskey owed a legal or fiduciary duty to Plaintiffs as a "company official" of Stone Street sufficient to sustain their negligence claim against her. *Cf. Timbercreek Land & Timber Co., LLC*, 2017 NCBC LEXIS 64, at *15 (finding defendant a "company official" where defendant was appointed a manager, had specific authority to act through a signed addendum to the operating agreement, and exclusively managed day-to-day operations of the business pursuant to that authority).

53. The Court similarly concludes that Plaintiffs' allegations are insufficient to permit a conclusion that Diane Siskey owed Plaintiffs a legal or fiduciary duty as a "*de facto*" officer of Stone Street. Even assuming that Chapter 57D permits recognition of a *de facto* officer in the limited liability context, which the Court assumes on these Motions but does not decide, the North Carolina appellate courts

have recognized that a *de facto* officer of a corporation under North Carolina law must "hold office under some degree of notoriety or color of title[,] . . . continuously exercise the functions of the office[,]" and "appear to hold an actual office[.]" *Havelock Yacht Club, Inc. v. Crystal Lake Yacht Club, Inc.*, 215 N.C. App. 153, 156, 714 S.E.2d 788, 790 (2011). Moreover, where a *de facto* corporate officer has been recognized under North Carolina law, our courts have required the *de facto* officer to have "authority for tasks such as signing tax returns, offering major input as to the company's formation and operation, or managing the company." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *43–44 (N.C. Super. Ct. Sept. 26, 2017) (quoting *Kinesis Advert., Inc. v. Hill*, 187 N.C. App. 1, 15–16, 652 S.E.2d 284, 295 (2007)). Plaintiffs have not alleged facts showing that Diane Siskey did any of these sorts of things here.

54. While Plaintiffs have alleged that Diane Siskey "handled all of [Stone Street's] leasing and insurance matters, and much of its administrative operations," (Am. Compl. ¶ 56), Plaintiffs do not allege that Diane Siskey possessed or exercised authority to sign Stone Street's tax returns, *see Lowder v. All Star Mills, Inc.*, 75 N.C. App. 233, 241, 330 S.E.2d 649, 655 (1985), hire and fire Stone Street employees, make purchases on behalf of Stone Street, *see Tai Sports, Inc. v. Hall*, 2012 NCBC LEXIS 64, at *48 (N.C. Super. Ct. Dec. 28, 2002), or engage in management activity on behalf of Stone Street utilizing "discretion and independent judgment," *Timbercreek Land & Timber Co., LLC*, 2017 NCBC LEXIS 64, at *15. Similarly, although Plaintiffs allege that Diane Siskey "regularly attended" important meetings and had to "approve" certain "major decisions regarding the corporate governance of [Stone

Street]," (Am. Compl. ¶¶ 56–57), Plaintiffs do not allege that Diane Siskey offered major input at any meetings she attended or that she actually approved any decisions of any kind. Finally, while Plaintiffs allege that Diane Siskey was "actively involved in the day-to-day management" of Stone Street, (Am. Compl. ¶ 56), Plaintiffs have not alleged that she actually managed the company, was delegated such authority, or made any significant decisions for the Company at any time, *cf. Lowder*, 75 N.C. App. at 241, 330 S.E.2d at 654–55 (finding *de facto* officer where officer "took over management of the companies").

55. As a result, the Court concludes that, while Plaintiffs have alleged Diane Siskey's active involvement in Stone Street, Plaintiffs have failed to allege that Diane Siskey had the type of management authority and engaged in the sort of management activity that our courts have required for her to be deemed a *de facto* officer of Stone Street under North Carolina law.

56. Based on these same considerations, the Court further concludes that Plaintiffs' allegations are insufficient to show that Diane Siskey had the requisite domination and control of Stone Street that our appellate courts have otherwise found necessary for the creation of a *de facto* fiduciary duty. *See, e.g.*, *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 352 (N.C. Ct. App. 2016) ("The standard for finding a *de facto* fiduciary relationship is a demanding one: 'Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a

fiduciary relationship has arisen.'" (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008)).

57. For each of these reasons, therefore, the Court concludes that Plaintiffs have failed to allege that Diane Siskey owed a legal or fiduciary duty to Plaintiffs sufficient to sustain their negligence claim against her. Accordingly, the Court concludes that Plaintiffs' negligence claim against Diane Siskey must be dismissed. *See, e.g.*, *Prince v. Wright*, 141 N.C. App. 262, 266, 541 S.E.2d 191, 195 (2000) ("If there is no duty, there can be no liability.").

E.   Breach of Fiduciary Duty Against Diane Siskey

58. Plaintiffs' breach of fiduciary duty claim against Diane Siskey also rests on Plaintiffs' contention that she is a "company official" and *de facto* officer of Stone Street. In light of the Court's conclusion that Plaintiffs have failed to allege facts showing that she is either, the Court concludes that Plaintiffs' claim for breach of fiduciary duty against Diane Siskey must likewise be dismissed.

F.   Constructive Fraud Against Diane Siskey

59. To survive a motion to dismiss, a cause of action for constructive fraud must allege (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured. *Sterner v. Penn*, 159 N.C. App. 626, 631, 583 S.E.2d 670, 674 (2003). Intent to deceive is not an element of constructive fraud. *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971). "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud

requirement that the defendant benefit himself." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004).

60.     Having concluded that Plaintiffs have failed to allege facts showing that Diane Siskey owed a fiduciary duty to Plaintiffs, the Court concludes that Plaintiffs' claim for constructive fraud must therefore be dismissed.

G.     <u>Aiding and Abetting Breach of Fiduciary Duty Against Diane Siskey and the MetLife Defendants</u>

61.     Judge Gale of this Court recently concluded and held in a very thorough and thoughtful opinion that "North Carolina does not recognize a claim of aiding and abetting breach of fiduciary duty." *Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP*, 2018 NCBC LEXIS 16, at \*32–34 (N.C. Super. Ct. Feb. 16, 2018). This Court finds Judge Gale's analysis persuasive and reaches the same conclusion. Accordingly, the Court concludes that Plaintiffs' claim for aiding and abetting breach of fiduciary duty under North Carolina law should be dismissed.[9]

V.

CONCLUSION

62.     **WHEREFORE**, for the foregoing reasons, the Court hereby **ORDERS** as follows:

   a. Diane Siskey's Motion to Dismiss is **GRANTED**, and Plaintiffs' claims against her are dismissed with prejudice.

---

[9] Judge Gale further determined that in the event the Supreme Court of North Carolina recognized such a claim, it would require the following prerequisites to establish aiding and abetting liability: "(1) the existence of a . . . violation by the primary party; (2) knowledge of the violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *Zloop, Inc.*, 2018 NCBC LEXIS 16,

b. The MetLife Defendants' Motion to Dismiss is **GRANTED**, and Plaintiffs' claims against each MetLife Defendant are dismissed with prejudice.[10]

**SO ORDERED**, this the 26th day of July, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

at \*35–38 (citing *Blow v. Shaughnessy*, 88 N.C. App. 484, 490–91, 364 S.E.2d 444, 447 (1988)). To establish "actual knowledge," Judge Gale concluded that a plaintiff must allege that the "primary party and the aiding and abetting party must have the same level of culpability or scienter." *Id.* at \*38 (quoting *Tong v. Dunn*, 2012 NCBC LEXIS 16, at \*14 (N.C. Super. Ct. Mar. 19, 2012)). Although the Court finds these conclusions persuasive, the Court declines to consider at this time whether the Amended Complaint states a claim in the event these elements later become prerequisites to any claim for aiding and abetting breach of fiduciary duty that our appellate courts may recognize.

[10] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013). In the context of a 12(b)(6) motion, "the party whose claim is being dismissed has the burden to convince the court that the party deserves a second chance[.]" *Id.* at 192, 749 S.E.2d at 293 (quoting *Johnson v. Bollinger*, 86 N.C. App. 1, 9, 356 S.E.2d 378, 383 (1987)). Here, the Court is not persuaded that Plaintiffs should be entitled to a third chance to plead their claims against Diane Siskey and the MetLife Defendants, particularly because Diane Siskey and the MetLife Defendants have each now fully briefed two motions to dismiss and because Plaintiffs had the opportunity to review and consider Diane Siskey's and the MetLife Defendants' full briefing on their initial motions to dismiss in preparing the Amended Complaint.